[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-11251
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 25, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-03191-CV-BBM-1

WARDEN STEPHEN BENTON,

                                        Plaintiff-Appellant,

versus

BRIAN HOPKINS,
JOHN ANDERSON,

                                        Defendants-Appellees,

COUNTY OF CHEROKEE,

                                        Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 25, 2006)**

Before BLACK, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

Stephen Benton appeals the district court's entry of summary judgment in favor of Officers Brian Hopkins and John Anderson of the Cherokee County Sheriff's Department on Benton's claim, filed under 42 U.S.C. § 1983, alleging use of excessive force during a traffic stop and attendant arrest. On appeal, Benton argues that the district court erred by concluding the officers were entitled to qualified immunity because Benton failed to allege a constitutional violation.[1] We disagree and, accordingly, affirm the entry of summary judgment based on qualified immunity.

The parties are familiar with the background facts, which were thoroughly described by the district court in its order, and we do not recount them again here. We review de novo a district court's entry of a summary judgment motion based on qualified immunity, applying the same legal standards as the district court. See

---

[1]We are unpersuaded by Benton's other arguments, which he makes in summary fashion, that his state law claims were valid, that the defendants were not entitled to official immunity, and that Benton presented sufficient evidence from which to infer a conspiracy existed between the defendants. Pursuant to Rule 28(a)(9) of the Federal Rules of Appellate Procedure, an appellant's brief must contain "(A) appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies; and (B) for each issue, a concise statement of the applicable standard of review." Fed. R. App. P. 28(a)(9)(A)-(B). We have held that the failure to elaborate or provide any citation of authority in support of an argument on appeal acts as a waiver of the argument for appellate purposes. See Flanigan's Enters., Inc. of Ga. v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001). Moreover, failure to offer argument on an issue abandons it. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n. 2 (11th Cir. 2005). Finally, and most fatal to the aforementioned additional arguments, is that passing references to issues are insufficient to raise the claim on appeal. Id.

Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).  We resolve all issues of material

fact in favor of the plaintiff, and then determine the legal question of whether the

defendant is entitled to qualified immunity under that version of the facts.  Id.

As we observed in Lee v. Ferraro:

> Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)) (additional quotations omitted).  The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, see Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

284 F.3d at 1193-94.

A government official who is sued under § 1983 may seek summary

judgment on the ground that he is entitled to qualified immunity.  Holloman ex rel.

Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004). To be eligible for

3

qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. Id. at 1263-64. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. Id. at 1264. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation, and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it. Saucier v. Katz, 533 U.S. 194, 201 (2001); Holloman, 370 F.3d at 1264. This two-step inquiry provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Here, it is not disputed that the officers were acting within the scope of their discretionary authority at all material times. The district court found that the force used to restrain a noncompliant Benton -- consisting of the use of pepper spray and multiple blows with an ASP baton, which is a retractable metal baton with a blunt tip -- was not excessive in nature and, indeed, was called for under the circumstances. Accordingly, on the first prong of Saucier, the district court concluded that Benton failed to present sufficient evidence to establish a

4

constitutional violation and the defendants were entitled to the defense of qualified immunity.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment encompasses a person's right to be free from the use of excessive force in the course of an investigatory stop or "seizure" of the person. See Graham v. Connor, 490 U.S. 386, 394-95 (1989). Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.

In an excessive force case, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer . . . to conclude the force was unlawful." See Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quotation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." See Graham, 490 U.S. at 396-97. We have said that "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably

5

proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198.

In determining whether an officer's use of force was objectively reasonable, the Court considers a variety of factors including "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (quoting Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986)). The Court also considers "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing." See Post, 7 F.3d at 1559 (citation omitted).

On appeal, Benton highlights two instances that he alleges were excessive force: (1) the use of pepper spray, and (2) the use of an ASP baton. When these two restraint methods were employed, the following circumstances existed. During a traffic stop, much of which was captured by a video camera mounted in the arresting officer's squad car, the officers had learned that Benton was driving with a license that had been revoked for a "serious violation." After being informed that he was under arrest for driving with a revoked license, Benton refused the officers' verbal commands. When Officer Hopkins moved behind Mr.

Benton and attempted an unarmed controlling technique to get Mr. Benton's arms in position for handcuffing, Mr. Benton did not comply. As the officers continued their attempts to restrain Benton, he struggled and, at one point, swung an elbow at the officers. It was after Benton attempted to pull away from the officers by twisting his own arm that Officer Hopkins attempted to spray Benton with pepper spray. After the wind blew the spray back in both officers' faces, Officer Hopkins ran up closer to Benton and fired a direct burst of pepper spray into Benton's eyes. After yelling at the officers, "I have contacts in, you asshole," Benton continued to struggle and act non-compliantly.

At some point after administration of the pepper spray, Benton attempted to back away. After Officer Anderson tried to tackle Benton, but lost his footing, Benton landed on top of Officer Anderson. It was at that point that Officer Hopkins struck Benton with the ASP baton, two or three times in the legs and once in the neck. As Officer Hopkins applied the strikes, he commanded Benton to comply. Hopkins stopped applying force when Benton stopped resisting. The length of the videotape recorded from Anderson's squad car revealed that the entire incident lasted about 40 seconds.

Even assuming Benton's version of the facts, we cannot say that the use of pepper spray to subdue him and force him to comply was unreasonable. We have observed:

> Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others. Shock and surprise may be proper and useful tools in avoiding unnecessary injury to everyone involved when dealing with potentially violent suspects. Given that pepper spray ordinarily causes only temporary discomfort, it may be reasonably employed against potentially violent suspects, especially those suspects who have already assaulted another person and remain armed.

McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003); see also Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (noting that "pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee"). "Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital." Vinyard, 311 F.3d at 1348. The factors we outlined in Slicker plainly weigh against finding a constitutional violation here. See 215 F.3d at 1233. The pepper spray was used based on Benton's continued resistance, and the use of pepper spray, in the face of Benton's non-compliance, plainly was proportional to the need for force.

8

Moreover, Benton presented <u>no</u> evidence that the officers acted in a malicious or sadistic manner. <u>Id.</u>

We likewise find that there was no evidence of excessive force resulting from the baton strikes, which followed Benton's continued non-compliance, even after the officers had administered the pepper spray directly in his eyes. Benton had started to back away in a manner that a reasonable officer could have construed as an attempt to flee, <u>see</u> <u>Post</u>, 7 F.3d at 1559 (stating that in evaluating an officer's use of force, Court will consider "whether the suspect [was] resisting or fleeing"). Moreover, when Officer Anderson tried to tackle him, Benton landed on top of the officer, thus pinning him down. It was after observing Benton on top of Anderson that Officer Hopkins applied the baton strikes. <u>Cf. id.</u> (enumerating "whether the suspect pose[d] an immediate threat" as a factor to consider when evaluating officer's use of force). Simply put, given the totality of the circumstances which faced the officers at the scene of the traffic stop and the events that developed when the officers tried to arrest Benton, there is no evidence sufficient to show that the force used was unreasonable. We agree with the district court's analysis of the first <u>Saucier</u> prong and its conclusion that, on this record, Benton did not satisfy his burden to show that the officers' conduct violated a constitutional right. Accordingly, we affirm the entry of summary judgment.

**AFFIRMED.**